```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
   CITIBANK, N.A.,                             :
                       Plaintiff,              :
                                               :
              -v-                              :
                                               :
   TORMAR ASSOCIATES LLC,                      :   15-CV-1932 (JPO)
                                               :
                       Defendant.              :   OPINION AND ORDER
------------------------------------------------------------X
   TORMAR ASSOCIATES LLC,                      :
                                               :
                  Counterclaim-Plaintiff,      :
                                               :
              -v-                              :
                                               :
   CITIBANK, N.A.,                             :
                                               :
                  Counterclaim-Defendant.      :
------------------------------------------------------------X
```

J. PAUL OETKEN, District Judge:

Plaintiff Citibank, N.A. ("Citibank") filed this breach of contract action on March 13, 2015. (Dkt. No. 1.) Defendant Tormar Associates LLC ("Tormar") filed an answer and counterclaim alleging breach of contract and breach of the implied covenant of good faith and fair dealing under New York law. (Dkt. No. 9.) On May 20, 2015, Citibank moved for judgment on the pleadings as to both its claim and Tormar's counterclaim. (Dkt. No. 15.) For the reasons that follow, Citibank's motion is granted.

**I.    Factual Allegations**

Tormar is a firm that engages in foreign exchange trading. (Dkt. No. 1 at ¶ 14.) Citibank provides foreign exchange prime brokerage services. (*Id.* at ¶ 12.) This dispute concerns three contracts between the parties: (1) a "Prime Brokerage Agreement"; (2) an "International Swaps and Derivatives Association Agreement" ("ISDA"); and (3) a "Credit Support Annex" ("CSA")

(collectively, "brokerage contracts"). (Dkt. Nos. 1-1, 1-2, 1-3.) Together, the brokerage contracts permitted Tormar to invest in foreign exchange markets using Citibank as a credit intermediary. Citibank alleges that Tormar breached the ISDA and CSA when it failed to pay outstanding debts. Tormar counters that Citibank breached the brokerage contracts, and violated the implied duty of good faith and fair dealing, by forcing Tormar to liquidate its portfolio under duress.[1]

### A.   The Brokerage Contracts

Tormar and Citibank entered into three separate agreements. The first, a Prime Brokerage Agreement ("PBA"), established the general terms of Citibank's brokerage services for Tormar. (Dkt. No. 1-1.) Under the PBA, Tormar could negotiate transactions with third parties in Citibank's name. (Dkt. No. 25, Def.'s Mem. in Opp. to J. Pleadings ("Def.'s Mem.") at 4.) Citibank would then enter into two transactions: one transaction with the third party and one offsetting transaction with Tormar. (Dkt. No. 16, Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") at 4.) The PBA thus allowed Tormar to trade on Citibank's creditworthiness. (*Id.*) It exposed Citibank to the benefits of Tormar's negotiations with third parties and to the risk that Tormar would not "meet its obligations to Citibank" if Citibank became liable to the third parties. (Dkt. No. 32 ("Pl.'s Letter") at 2.)

The two other contracts—the ISDA and CSA—set out Tormar's rights and duties with respect to its foreign exchange transactions with Citibank. (Dkt. No. 1-2, 1-3.) These agreements required Tormar to post collateral and specified when Tormar was in default on its obligations to Citibank. (Dkt. No. 1-3 § 13(l)(ii)-(iv).) Under the CSA, Tormar would default if

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Citibank is a citizen of South Dakota. Tormar, as a limited liability company, has the citizenship of each of its members, both of whom are citizens of Connecticut.

it failed to keep the combined value of its investments and collateral—*i.e.*, its "Net Equity"—at a certain level. (*Id.* § 13(l)(iii)-(iv).) Specifically, the CSA required Tormar to keep its Net Equity at more than 60 percent of the total collateral it was required to post. (*Id.*; Pl.'s Mem. at 8.) This "Net Equity provision" protected Citibank by "provid[ing] a buffer in case [Tormar's] portfolio decreased in value." (Pl.'s Mem. at 8.)

The ISDA and CSA (collectively, "ISDA Agreements") also established procedures for "terminating" Tormar's account in the event of a default. (Dkt. No. 1-2 at § 6(a); Dkt. No. 1-3 at § 8(a).) Under the agreements, if one party defaulted, the other was entitled to send a notice of default designating "an Early Termination Date in respect of all outstanding Transactions." (Dkt. No. 1-2 § 6(a).) Upon the "Early Termination Date," the parties were no longer required to make "further payments or deliveries" to one another. (*Id.* § 6(c)(ii).) Termination thus froze the parties' transactions at a particular moment in time. The parties would then exchange calculation statements showing the amount they believed they owed one another in light of the termination ("Early Termination Amount"). (*Id.* § 6(d)(i).) The ISDA Agreements contain a formula for determining the Early Termination Amount. (*Id.* § 6(e).) They also specify that any collateral can be offset against the total amount due. (Dkt. No. 1-3 § 8(a)(iii).)

B.    **Events of January 15, 2015**

Tormar began using Citibank's brokerage services in 2009. (Pl.'s Mem. at 3.) By 2015, Tormar's portfolio "included large positions betting that the value of the Swiss franc would decrease relative to the U.S. dollar." (*Id.* at 5.) This dispute concerns the events of January 15, 2015, when a sudden spike in the franc's value caused Tormar to suffer significant losses.

The parties offer conflicting accounts of events on January 15. Tormar alleges that, at 5:35 a.m. that day, a Citibank employee left a message with John Tormondson, Tormar's

3

principal, "indicating that Tormar was facing a significant margin call" and threatening to "close out" Tormar's positions if Tormondson did not return his call. (Dkt. No. 9, Counterclaim ("Countercl.") at ¶ 24.) Upon hearing the message, Tormondson exchanged a series of calls with George Reynolds, a Citibank employee. (*Id.* at 25.) According to Tormar, Reynolds "demanded that Tormar immediately post additional collateral" and stated that Citibank required Tormar to "liquidate its portfolio . . . immediately and through Citibank's own options desk." (*Id.* at ¶¶ 25-26.) When Tormondson "asked Citibank to demonstrate some restraint . . . Reynolds reiterated that Tormar had no other choice" and "proceeded to force the liquidation over [Tormondson's] objections." (*Id.* at ¶ 26.)

Citibank, in contrast, describes a mutual agreement to trade. According to its version of events, a Citibank employee called Tormondson on the morning of January 15 and advised him that, in light of the franc's surge, "Tormar was obligated to post approximately $25 million in additional collateral." (Pl.'s Mem. at 5-6.) According to Citibank, Tormondson stated that the required margin call was "not anywhere close to [his] ability" and "acknowledged the need to close out the account." (*Id.* at 6.) The parties then worked together "to 'unwind' Tormar's positions so as to prevent further losses." (*Id.*) Citibank alleges that Tormar started to trade on its own on January 15, and decided to use Citibank's options desk only later in the day, because Tormar "liked [Citibank's] pricing." (*Id.* at 6-7.)

The parties agree that, at some point on January 15, Citibank cancelled its Prime Brokerage Agreement with Tormar. (Dkt. No. 1, Complaint ("Compl.") at ¶ 32; Dkt. No. 9 Answer at ¶ 32.) They also agree that, on January 20, Citibank sent Tormar a notice declaring a default. (Compl. ¶ 37; Answer ¶ 37; *see also* Dkt. No. 1-4.) The notice stated that Tormar had violated the Net Equity provision on January 15 and continued to be in violation of that

provision—and thus, in default—on January 20.  (Dkt. No. 1-4)  Citibank designated January 20, 2015 as the Early Termination Date.  (*Id.* at 1.)

Two weeks later, Citibank sent Tormar a calculation statement listing an Early Termination Amount of $35,258,088.47.  (Dkt. No. 1-5 at 1.)  After offsetting the $10,052,480.51 that Tormar had posted in collateral, Citibank demanded $25,205,607.96.  (*Id.* at 2.)  To date, Tormar has not paid Citibank and Citibank has not returned Tormar's collateral.

## II.     Procedural History

Citibank filed this breach of contract action against Tormar on March 3, 2015.  (Dkt. No. 1.)  On April 22, 2015, Tormar filed an answer and a counterclaim alleging breaches of contract and of the implied covenant of good faith and fair dealing.  (Dkt. No. 9.)  Citibank filed an answer to Tormar's counterclaim on May 13, 2015 and moved for judgment on the pleadings one week later.  (Dkt. Nos. 14, 15.)  That motion was fully briefed in July 2015.  (Dkt. No. 26.)  The Court subsequently requested letters briefs addressing certain legal questions, which were filed on October 20, 2015.  (Dkt. Nos. 31, 32.)  The Court heard oral argument on November 10, 2015.

## III.    Legal Standard

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial."  Judgment on the pleadings is appropriate when a party has "established that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law."  *Gioconda Law Grp.*, 941 F. Supp. 2d 424, 426-27 (S.D.N.Y. 2013) (citations omitted).

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim."  *Id.* (citing *Patel v. Contemporary*

*Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001)). "In both postures, the district court must accept all allegations in the non-movant's pleadings as true and draw all inferences in [that party's] favor." *Id.* at 427. However, the court need not "accord '[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness.'" *In re Bakery & Confectionery Union & Industry Intern. Pension Fund Pension Plan*, 865 F. Supp. 2d 469, 471-72 (S.D.N.Y. 2012) (quoting *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)).

## IV.  Discussion

Under New York law,[2] an action for breach of contract requires proof of: (1) a binding agreement; (2) performance by one party; (3) breach by the other party; and (4) damages. *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008); *see also McCormick v. Favreau*, 82 A.D. 3d 1537, 1541 (N.Y. App. Div. 2011). The parties agree that the brokerage contracts were valid agreements. (Compl. ¶ 12; Answer ¶ 39.) They dispute who breached the contracts and when the operative breach occurred.

Citibank argues that Tormar breached the ISDA Agreements when it failed to pay the Early Termination Amount after defaulting under the Net Equity provision. (Pl.'s Mem. at 2.) Tormar contends that Citibank breached the brokerage contracts by terminating Tormar's account before declaring a default. (Def.'s Mem. at 20.) Specifically, Tormar alleges that Citibank "required Tormar to agree" to trade under "economic duress," five days before sending a notice of default.[3] (Countercl. ¶ 29; Def.'s Mem. at 20.) Tormar asserts that Citibank's

---

[2] The parties agree that New York law governs the brokerage contracts. *See* Dkt. No. 1-2 at 37; Pl.'s Mem. at 2; Def.'s Mem. at 11-25 (citing New York law).

[3] Tormar offers various theories as to which contractual provision Citibank breached. (Def.'s Mem. at 20.) In its opposition brief, Tormar argues that Citibank breached § 6 of the ISDA, which requires notice prior to the termination of an account, and § 11 of the CSA, which requires the parties to act in a commercially reasonable manner. (Dkt. No. 1-2 § 6(a)-(c); Dkt. No. 1-3

conduct excused Tormar from any subsequent duty to perform, and thus, from any obligation to pay the Early Termination Amount. (Def.'s Mem. at 20.) Tormar also contends that Citibank breached the ISDA Agreements, and the implied covenant of good faith and fair dealing, by requiring Tormar to use Citibank's options desk to "unwind" its transactions. (Countercl. ¶¶ 30, 41.)

### A. Economic Duress

The core issue in this suit is whether Citibank forced Tormar to trade on January 15. The parties agree that (1) the brokerage contracts were valid, (2) a default under the ISDA Agreements could trigger termination, (3) and Citibank sent Tormar a notice of termination on January 20. (Dkt. No. 26, Pl.'s Reply at 8; Def.'s Mem. at 5, 9.) They also appear to agree that Tormar defaulted under the Net Equity provision on January 15 and continued to be in default through January 20. (*See* Def.'s Mem. at 20 ("Tormar's issue is not with Citibank choice of Events of Default.").) Tormar concedes, in other words, the facts necessary to establish Citibank's breach of contract claim. The only question is whether the transactions on January 15 were consensual. If they were, Citibank has alleged facts sufficient to succeed on its motion. If they were not, Tormar may have a defense to Citibank's claim and a counterclaim of its own.

The Court thus begins with the question of consent. Tormar asserts that Citibank "forced the close out of [its] positions" over a period of several hours on January 15. (Def.'s Mem. at 20.) Tormar does not dispute that it participated in the relevant transactions, nor does it allege that it refused to trade with Citibank. (*See id.* at 22; Countercl. ¶¶ 29, 31.) To the contrary, at oral argument, Tormar conceded that its representatives said "yes" to Citibank employees before

---

§ 11(d); *see* Def.'s Mem. at 20-22.) In supplemental briefing and at oral argument, Tormar also appears to allege violations of an implied notice requirement in the PBA. (Dkt. No. 31 ("Def.'s Letter") at 2.)

the transactions occurred.  Tormar argues that these statements were made under economic duress, and thus, that its consent to the trades was invalid.[4]  (Def.'s Mem. at 20.)

To establish economic duress under New York law, a party must show (1) a threat, (2) that was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative. *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*. 655 F.3d 136, 142 (2d Cir. 2011) (collecting authorities).  In general, agreements governed by New York law "may be voided on grounds of economic duress only in 'extreme and extraordinary cases.'"  *Davis & Assocs., Inc. v. Health Mgmt. Servs., Inc.*, 168 F. Supp. 2d 109, 114 (S.D.N.Y. 2001) (citing *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 123 (2d Cir. 2001)).

Duress is particularly difficult to meet in cases involving sophisticated actors.  *Id.*  To demonstrate duress, a sophisticated party must do more than allege "financial or business pressure" or unequal bargaining power.  *Id.*; *see also DuFort v. Aetna Life Ins.*, 818 F. Supp. 578, 581 (S.D.N.Y. 1993) ("[F]inancial or business pressure of all kinds, even if exerted in the context of unequal bargaining power, does not constitute economic duress.").  Instead, a party asserting duress must show "that the [other party's] actions deprived him of his free will, and that the ordinary remedy of an action for breach of contract would not be adequate." *Davis*, 168 F. Supp. 2d at 114 (citing *Berman v. Parco*, No. 96-CV.-0375, 1996 WL 465749, at *8

---

[4] In its briefing, Tormar asserts that it need not meet the standard for duress in order to assert a defense to Citibank's breach of contract claim.  (Def.'s Mem. at 20.)  The Court inquired into this assertion at oral argument.  In light of Tormar's response, the Court understands Tormar's argument to be that, even if Citibank's conduct does not rise to the level of duress, Citibank's decision to cancel the PBA breached its duty of good faith and excused Tormar's subsequent performance.  As is explained below, the Court concludes that Citibank's conduct with respect to the PBA did not breach a duty of good faith.  Accordingly, to the extent that Tormar's good faith argument is a defense to Citibank's claim, rather than the basis for its counterclaim, Tormar's defense fails.

(S.D.N.Y. Aug. 15, 1996)); *see also Bethlehem Steel Corp v. Solow*, 63 A.D. 2d 611, 611 (N.Y. App. Div. 1978) ("Duress . . . must involve a wrongful act or threat precluding the exercise of a free will.").

Tormar identifies two sources of duress: (1) Citibank's decision to cancel the parties' Prime Brokerage Agreement; and (2) Citibank's alleged threat to liquidate Tormar's portfolio without consent. (Def.'s Letter at 3; Def.'s Mem. at 21.) Even accepting all of Tormar's allegations as true, and construing all inferences in its favor, neither of these actions amounts to economic duress.

### 1. Cancellation of the Prime Brokerage Agreement

The parties agree that Citibank "canceled" the PBA on January 15. (Compl. ¶ 32; Answer ¶¶ 29, 32.) They dispute whether cancellation of the contract constituted economic duress. Citibank argues that, because it had a right to cancel the PBA, and because duress requires an unlawful act, the decision to cancel the PBA cannot support an allegation of duress. (Pl.'s Letter at 3-4; *see also Interpharm*, 655 F.3d at 142.) Tormar contends that cancellation of the PBA violated the contract and left Tormar unable to offset its sudden losses. (Def.'s Letter at 1, 3.)

Section 7 of the PBA provides that the contract can be "cancelled by either [party] . . . with immediate effect upon written or telephonic notice." (Dkt. No 1-1 § 7.) Citibank asserts that § 7 entitled it to cancel the PBA by telephone on January 15. (Pl.'s Letter at 3.) Tormar argues that notice provisions in the ISDA Agreements displace the language of § 7. (Def.'s Letter at 2-3.) Tormar urges the Court to read a more robust notice requirement into the PBA. (*Id.*)

The Court declines to adopt this construction. While the PBA and the ISDA Agreements must be read in tandem, these contracts confer separate rights and contain separate cancellation provisions. The PBA authorizes Tormar to use Citibank's credit to negotiate trades with third parties and states, in language that could hardly be clearer, that either party may end the agreement "with immediate effect." (Dkt. No. 1-1 § 7.) In contrast, the ISDA Agreements govern the parties' foreign exchange transactions with one another and provide for termination of those transactions upon written notice. (*See* Dkt. No. 1-2 § 12.) Under the plain language of these agreements, Citibank could withdraw Tormar's ability to trade on Citibank's credit without terminating transactions between the parties made pursuant to the ISDA Agreements. Because the contracts govern separate aspects of the relationship between Citibank and Tormar, there is no basis for ignoring § 7 of the PBA.

Moreover, even if it Citibank had to give Tormar additional notice before terminating the PBA, Tormar has not pleaded facts sufficient to establish duress. Tormar alleges that cancellation of the PBA "stripped Tormar of its ability to 'unwind its positions'" and "left Tormar at Citibank's mercy." (Def.'s Letter at 3.) Tormar also asserts that it "will prove at trial that, after Citibank terminated the [PBA], Tormar had no access to prime brokerage services." (*Id.* at 2.) Even if this is true, it remains unclear why Tormar could not have refused to deal with Citibank and pursued contract remedies for any damages incurred. *Davis*, 168 F. Supp. 2d at 114 (noting that economic duress is not present where contract remedies are adequate). Tormar is a sophisticated market actor that, at the time of the alleged duress, was accustomed both to foreign exchange transactions and to trading with Citibank as its broker. In these circumstances, duress requires not just financial pressure, but the absence of free will. *Davis*, 168 F. Supp. 2d at 114.

Tormar has demonstrated that it made a bad bet on the Swiss franc, and, assuming its allegations are true, that Citibank placed it under significant pressure to trade. Tormar has not, however, pleaded facts sufficient to establish that Citibank's conduct created the "extreme and extraordinary" circumstances of economic duress. *VKK Corp.*, 244 F.3d at 123.

### 2. Threat to Act Without Consent

The second basis for duress identified by Tormar is Citibank's alleged threat to act without Tormar's consent. (Def.'s Mem. at 20.) According to Tormar, Citibank representatives said "Tormar had no choice" but to trade and threatened to consummate transactions "whether or not Tormar cooperated." (*Id.* at 21.) Thus, Tormar asserts, it had no alternative than to say "yes" to the transactions Citibank proposed. Tormar cites Tormondson's participation in the trades—and in particular, his decision to communicate with Citibank throughout the liquidation, identifying better prices—as proof that the transactions were involuntary. (*Id.* at 22-23; Countercl. ¶ 31.)

This argument fails for the same reasons that cancellation of the PBA does not constitute economic duress. Assuming every transaction required consent, the threat to act without consent does not "preclud[e] the exercise of free will," particularly when made to the principal of a firm that specializes in foreign exchange trading. *Berman*, 1996 WL 465749, at *7. In the face of Citibank's threat, Tormar could have refused to cooperate and, if Citibank proceeded, sued for breach of contract. Instead, Tormar said "yes" to the transactions and communicated with Citibank representatives as those transactions took place. While the Court must draw all inferences in Tormar's favor, it need not accept its legal conclusion that duress exists. *In re NYSE Specialists Sec. Litig.*, 503 F.3d at 95. Tormar has not pleaded facts sufficient to support its allegation of duress.

11

### B. Good Faith Requirement

Tormar's second line of argument rests on Citibank's duty to deal with its counterparty in good faith. Tormar alleges that Citibank breached the duty of good faith in two respects—first, by canceling the PBA, and second, by forcing Tormar it to use the Citibank options desk. (Countercl. ¶¶ 26, 31; Def.'s Mem. at 22; Def.'s Letter at 2.)

Section 11 of the CSA imposes a good faith requirement on both parties. (Dkt. No. 1-3 § 11(d).) Specifically, the contract states that, "[p]erformance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner." (*Id.*) Citibank argues that this provision applies only to its calculations of Tormar's collateral and the Early Termination Amount—not, in other words, to the manner in which Citibank conducted its transactions with Tormar. (Pl.'s Mem. at 24.) But there is no such restriction in the CSA, which "forms part of" the ISDA and expressly states that the good faith requirement is "not limited to" calculations. (Dkt. No. 1-3 at 1, § 11(d).) The better reading of CSA § 11(d) is that Citibank and Tormar were both subject to a good faith and commercial reasonableness requirement when trading under the brokerage agreements.[5]

However, while Tormar's construction of the CSA prevails, it has not pleaded facts sufficient to establish that Citibank breached that contract. As to cancellation of the PBA, for the reasons stated above, the Court concludes that PBA § 7 gave Citibank a contractual right to

---

[5] The Court concludes that a good faith requirement applied both to the ISDA Agreements and the PBA. Unlike the cancellation provisions discussed above, there are not conflicting clauses concerning good faith in the PBA and the ISDA Agreements. Accordingly, there is no reason to exempt the PBA from the CSA's good faith requirement. Moreover, even if the explicit good faith provision in CSA § 11(d) did not govern the PBA, the PBA would be subject to an implied duty to act in good faith, which applies to all contracts under New York law. *See 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002).

withdraw Tormar's ability to use Citibank's credit on January 15.  Tormar argues that, despite this right, cancellation of the PBA was an act of bad faith because it conflicted with industry custom regarding brokerage agreements.  (Def.'s Letter at 2.)  This argument fails for two reasons.

First, it is elemental in contract law that extrinsic evidence of custom is permissible only where contract language is ambiguous, which it is not here.  *RJE Corp. v. Northville Indus. Grp., Inc.*, 329 F.3d 310, 314 (2d Cir. 2003).  Second, Tormar has not explained how cancellation of the PBA was an act of bad faith.  Under New York law, the duty of good faith prohibits parties from exercising their contract rights as part of a "scheme to deprive the other party of the fruit of its bargain."[6]  *Duration Mun. Fund, L.P., v. J.P. Morgan Sec. Inc.*, No. 603486-2008, 2009 WL 2999201, at *6 (N.Y. Sup. Ct. Sept. 16, 2009); *see also Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 333 (S.D.N.Y. 2010) (citations omitted).  Tormar has not alleged such a scheme.  Rather, its argument for breach of CSA § 11(d) is essentially that withdrawing Tormar's access to Citibank's credit put Tormar in an extremely difficult position.  These allegations are insufficient to override the clear terms of the parties' agreements.

As to use of the Citibank options desk, Tormar argues that Citibank violated CSA § 11(d) by forcing Tormar to say "yes" to trades conducted through its options desk. (Def.'s Mem. at 23.)  Like the first duress allegation, this argument fails because Citibank's conduct, even construed in the light most favorable to Tormar, does not constitute duress.  Tormar does not dispute that it formally agreed to use Citibank's desk, and Tormar has not presented facts that

---

[6] In construing CSA § 11(d), the Court relies on New York's standard for violations of the implied covenant of good faith and fair dealing.  Tormar has not alleged—either in its briefing or at oral argument—that the contractual duty in CSA § 11(d) is different in any material respect from the implied duty under New York law.

permit the Court to conclude that its consent was extracted through economic duress. Without duress, the trades on January 15 are indistinguishable from any other transactions the parties made under the ISDA Agreements.

### C.    Implied Covenant of Good Faith

Tormar's final argument is that Citibank breached an implied covenant of good faith and fair dealing when it required Tormar to use Citibank's options desk. (*Id.* at 24.) Parties to a valid contract are subject to an implied duty to deal in good faith even where no explicit duty exists. *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002); *see also Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). Tormar and Citibank were subject to such a duty in their dealings with one another.

However, courts in this district have consistently dismissed claims based on the implied covenant of good faith where those claims duplicate a plaintiff's breach of contract theory. *See, e.g., TVT Records v. Island Def Jam Music Grp.*, 244 F. Supp. 2d 263, 277 (S.D.N.Y. 2003) ("[A] claim for breach of the covenant "will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach . . . of an express provision of the underlying contract." (citation omitted)).

Tormar alleges that Citibank breached the implied covenant when it "requir[ed] that the liquidation of Tormar's positions be effectuated through Citibank's own trading desk." (Def.'s Mem. at 24.) While Tormar describes Citibank's actions as "extra-contractual" in its claim for breach of the implied covenant, its argument that Citibank breached CSA § 11(d) is based on exactly the same conduct. (*Id.* at 22-24.) It fails for the same reasons. In any event, Tormar cannot have it both ways. Because Tormar's covenant claim reiterates its contract claim, the former claim should be dismissed.

## V. Conclusion

For the foregoing reasons, Citibank's motion for judgment on the pleadings is GRANTED as to both its contract claim and Tormar's counterclaim.

The Court hereby directs the parties to confer in an effort to reach agreement on the issue of damages and to submit a proposed order by December 23, 2015. If the parties are unable to reach an agreement, they shall submit a joint letter by the same date with a proposed schedule for briefing (or other proceedings) on the issue of damages.

The Clerk of Court is directed to close the motion at Docket Number 15.

SO ORDERED.

Dated: November 17, 2015
       New York, New York

_____
J. PAUL OETKEN
United States District Judge